IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PATRICIA D. GRAHAM, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 2:22-cv-514 |
| ) | Magistrate Judge Patricia L. Dodge |
| v. ) | |
| ) | |
| RICHARD K. DOTSON, et al., ) | |
| ) | |
| Defendants. ) | |

### MEMORANDUM OPINION[1]

Plaintiff Patricia D. Graham ("Graham") brings this civil rights action against Richard K. Dotson, Moris Richardson, Sherri Lee, Thomas Smith, Don Leap, Rebecca Dorsey, Michelle Niles, and Tilesha Ragland-McClurkin (collectively "Defendants"). Graham's claims arise from her confinement at Pittsburgh Community Corrections Center ("Pittsburgh CCC"), a facility operated by the Pennsylvania Department of Corrections (the "DOC"). Pending before the Court is Defendants' Motion for Summary Judgment (ECF No. 48). For the following reasons, the motion will be granted.

### I.   Relevant Procedural History

Graham initiated this action by filing a counseled complaint on March 14, 2022. Initially, the Complaint brought two counts—negligence (Count I) and "deprivation of rights pursuant to 42 U.S.C. § 1983" (Count II)[2]—against Defendants in their individual and official capacities,

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case. The undersigned therefore has the authority to decide dispositive motions and enter final judgment.

[2] Count II alleges: "The aforementioned conduct violated her rights under the 14th Amendment of the United States Constitution." (ECF No. 1 ¶ 69.) Because Graham was a convicted and sentenced state prisoner at the time of the alleged conduct, the Eighth Amendment provides the explicit source of constitutional protection for her claim of deliberate indifference. *See Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that

Pittsburgh CCC, and the DOC. (ECF No. 1.)

After filing their answer (ECF No. 6), Defendants, Pittsburgh CCC, and the DOC moved for judgment on the pleadings (ECF No. 7). The motion and accompanying brief argued that the claims against Defendants in their official capacities and any claims against Pittsburgh CCC and the DOC were barred by the Eleventh Amendment. (ECF No. 8 at 6.) Graham's response (ECF No. 13) conceded that the Eleventh Amendment did in fact bar those claims but maintained that the suit could continue against Defendants in their individual capacities. As a result, the Court granted the motion and dismissed with prejudice all claims against Pittsburgh CCC and the DOC. The Court also dismissed with prejudice all claims against Defendants in their respective official capacities and for injunctive or declaratory relief. (ECF No. 14.)

Following the conclusion of discovery, Defendants moved for summary judgment on both claims. (ECF No. 48.) The motion is now fully briefed (ECF Nos. 49, 50, 51, 53, 54, 55) and is ready for disposition.

## II. Relevant Factual Background

Graham was transferred to Pittsburgh CCC on February 19, 2020. Upon arrival, she immediately underwent a wellness screening and completed an intake form. (ECF Nos. 51-1; 51-2.) At that time, she reported no physical disabilities, no recent injuries or hospitalizations, and checked "YES" when asked if she felt physically well.[3] (ECF No. 51-2 at 1.) She also "check[ed]

---

Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'"). The parties also chose not to address the Fourteenth Amendment in their briefing. Therefore, the Court construes Count II as asserting a claim under the Eighth Amendment only and will analyze it as such.

[3] Graham denies Defendants' assertion that the wellness screening indicated no medical concerns based on her need for prescription medication. (ECF No. 54 ¶ 5.)

2

the box that she was in the possession of and/or taking prescribed medication."[4] (ECF No. 54 ¶ 5.)

After intake, Graham was assigned to a top bunk, which she was initially "ok" with. (ECF No. 50 ¶ 6) (ECF No. 54 ¶ 17.) Immediately before arriving at Pittsburgh CCC, Graham had been incarcerated at several other DOC-operated facilities that also utilized bunk beds. She was previously assigned to and regularly slept in a top bunk while incarcerated at: Blair County Prison for six days; State Correctional Institution ("SCI") Muncy for two months; and SCI Cambridge Springs for four months. (ECF No. 50 ¶¶ 7-9.) She was then transferred to Renewal rehabilitation center where she was assigned a top bunk for her entire eight week stay. (*Id.* ¶¶ 12-13.) Graham never requested that she be reassigned to a bottom bunk at any of these facilities and had never reported any issues or concerns falling from the top bunk. (*Id.* ¶¶ 10, 15-16.)

While at SCI Cambridge Springs and Renewal, Graham was prescribed and regularly taking Effexor, Ibuprofen, and Celexa. (*Id.* ¶¶ 11, 14.) After transferring to Pittsburgh CCC, Graham started taking Suboxone and "a mild sleeping pill" in addition to her other medications.[5] (*Id.* ¶ 18) (ECF No. 51-4 at 26.) The new medications were prescribed by Dr. Payel, a non-DOC affiliated physician. (ECF No. 50 ¶ 19.) Graham said that Dr. Payel did discuss the side effects of Suboxone with her, but she was never warned against sleeping on the top bunk. (ECF No. 51-4 at 34.)

Shortly after starting Suboxone, Graham learned from another Pittsburgh CCC inmate that she had begun "sitting up in [her] sleep and . . . swaying back and forth." (ECF No. 51-4 at 32.) Graham believed that this behavior was caused by the Suboxone and felt that sleeping in a top

---

[4] The medications Effexor, amitriptyline, Motrin, and albuterol are listed in the "Medication" section of Graham's intake form. (ECF No. 51-1.)
[5] Graham testified that she began taking Suboxone within a week of arriving at Pittsburgh CCC. (ECF No. 54-4 at 27.)

3

bunk was no longer safe.[6] (ECF No. 54 ¶ 122.) She spoke with Defendant Michelle Niles ("Niles"), a counselor at Pittsburgh CCC,[7] about switching to a bottom bunk. (ECF No. 50 ¶ 24.) Graham was unsure what exactly she had told Niles about her desire to switch bunks but said at her deposition that "[Niles] knew I was on Suboxone but I don't think I made her aware that that was why I was sitting up." (ECF No. 51-4 at 36.)

Niles told Graham that Pittsburgh CCC procedure required that she provide an excuse from a doctor stating a medical need for the bunk reassignment. (ECF No. 50 ¶¶ 23, 24) (ECF No. 54 ¶¶ 23, 24.) Niles never received a letter from a doctor related to Graham's need for a bottom bunk. (ECF No. 50 ¶ 24.) Graham never spoke with Dr. Payel or anyone else at her office about whether she should be moved to a lower bunk. (ECF No. 51-4 at 34.)

Graham recalls telling a Pittsburgh CCC employee, possibly Defendant Sherri Lee ("Lee"),[8] that she was going to start sleeping on the floor. On one occasion, Graham moved her blankets to the floor, but said that Lee told her that she would get a misconduct if she did not get back in her bunk. Graham complied. (*Id.* at 37-38.) There is no evidence in the record that Graham told Lee why she wanted to sleep on the floor.

On March 15, 2020, Graham fell from her bunk. (ECF No. 50 ¶ 28.) Graham's fall caused her to hit her head, sustaining serious physical injuries.[9] (*Id.* ¶¶ 28-29.) Defendant Thomas Smith

---

[6] Graham has not submitted any evidence to support her belief.

[7] At her deposition, Niles testified that she is not a mental health counselor and that the title "counselor" at Pittsburgh CCC is more akin to "camp counselors that help people adjust to environments and work through whatever they need to work through[.]" (ECF No. 55-2 at 40.)

[8] Graham referred to the employee as "the one with the sneakers" but believes that it was "Miss Lee." (ECF No. 51-4 at 37-38.)

[9] The Complaint alleges that, among other things, Graham suffered traumatic brain injury, right maxillary sinus fracture, nasal fracture, right C7/T2 TP fractures, left occipital condyle fracture, and multiple broken ribs. Additionally, it alleges that Graham has experienced seizures, mood swings, emotional issues, and loss of memory. (ECF No. 1 ¶ 52.) There is no supporting medical documentation in the record.

("Smith") was the first Pittsburgh CCC employee to respond to Graham's room. Smith found Graham lying on the floor and advised her not to move in case there was a neck or back injury. Unsure of her condition, Smith called down to the Pittsburgh CCC front desk. (*Id.* ¶ 31) Lee answered the call and contacted 911. EMS arrived and transported Graham to UPMC Shadyside for treatment. (*Id.* ¶ 32.) After Graham was admitted to the hospital, Defendants Rebecca Dorsey and Don Leap spoke with Graham to see how she was doing. (*Id.* ¶ 33.)

### III.  Legal Standard

The Federal Rules of Civil Procedure provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party and must draw all reasonable inferences and resolve all doubts in that party's

5

favor. *Hugh v. Butler Cty. Fam. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005); *Doe v. Cty. of Centre, Pa.*, 242 F.3d 437, 446 (3d Cir. 2001).

IV.     **Discussion**

   A. **Eighth Amendment claim**

Graham's Complaint alleges that Defendants violated her Eighth Amendment rights by "ignoring the obvious dangerous condition" of allowing her to sleep in a top bunk after she expressed concerns regarding her safety. (ECF No. 1 ¶ 63.) Defendants argue that Graham's § 1983 claim should be dismissed because the conditions of her confinement at Pittsburgh CCC do not objectively rise to the level of an Eighth Amendment violation. (ECF No. 49 at 6-9.)

The Eighth Amendment prohibits cruel and unusual punishment that "violates civilized standards of humanity and decency." *Griffin v. Vaughn*, 112 F.3d 703, 709 (3d Cir. 1997). Prison conditions are cruel and unusual if they deprive inmates of basic human needs, such as food, sanitation, and medical care. *Rhodes v. Chapman*, 452 U.S. 337, 347-48 (1981). The Eighth Amendment does not, however, require prisons to be comfortable. *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 373 (3d Cir. 2019) (citing *Rhodes*, 452 U.S. at 349). To succeed on a claim brought under the Eighth Amendment, a prisoner must show: (1) that they were subjected to a deprivation that was "objectively, sufficiently serious" such that a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities; and (2) that prison officials acted with "deliberate indifference," which occurs only if the official "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 828, 837 (1994).

"Courts have found that it can be an Eighth Amendment violation where an inmate has a

6

serious medical need requiring [them] to use the bottom bunk, but prison officials are deliberately indifferent to that need." *Saunders v. GEO Grp., Inc.*, 2019 U.S. Dist. LEXIS 185765, at *12 (E.D. Pa. Oct. 24, 2019) (quoting *Whitehead v. Wetzel*, 2016 U.S. Dist. LEXIS 72732, at *24 (W.D. Pa. June 2, 2016)). *See also Hunter v. Barrett*, 2022 U.S. Dist. LEXIS 236357, at *14 (W.D. Pa. Nov. 16, 2022). To establish liability, a § 1983 plaintiff nonetheless bears the burden of showing that each defendant was personally involved in the alleged constitutional violation. *See Saisi v. Murray*, 822 Fed. Appx. 47, 48 (3d Cir. 2020). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence" and such allegations "must be made with appropriate particularity." *Hunter*, 2022 U.S. Dist. LEXIS 236357, at *15 (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). That is to say, each defendant "must have played an 'affirmative part' in the complained of misconduct." *Id.* (citing *Chinchello v. Fenton*, 805 F.2d 126, 133 (3d Cir. 1986)).

Defendants argue that Graham failed to identify which, if any, of the Defendants she spoke to or what she said regarding her alleged medical need for a lower bunk. (ECF No. 49 at 7-8.) Thus, they contend not only that Graham failed to sufficiently allege each Defendants' personal involvement, but also that the record lacks any evidence showing that Defendants knew about Graham's bunk assignment or that they were aware of her allegedly elevated risk of falling. (*Id.* at 3.)

The majority of Graham's brief focuses on alleged discrepancies in Pittsburgh CCC staff's understanding of the policy relating to inmate bunk assignments. She argues that inconsistencies in Defendants' deposition testimony "calls in to question whether or not [Defendants] complete testimony is credible, including if [they] knew of Graham's request and did nothing, which could

7

prove deliberate indifference." (ECF No. 53 at 6.) But determining the credibility of testimony and assigning weight to evidence is a function reserved for the jury, far beyond the scope of summary judgment review. *Anderson*, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not [herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). The varying accounts of Pittsburgh CCC staff regarding the existence and terms of any policy about bunk assignments may impact their credibility in that respect or may simply reflect a differing understanding of the policy. In any event, this evidence is irrelevant to whether any of them had personal involvement in violating Graham's constitutional rights or knew of Graham's medical condition or needs.

Graham also cites a myriad of "facts" purporting to show that each of the Defendants was aware of her elevated risk of falling and still chose not to reassign her to a bottom bunk. (*See* ECF No. 53 at 3-9.) She contends that since she did not start taking the new medication until after she had transferred to Pittsburgh CCC, she had no reason to protest her initial bunk assignment. (*Id.* at 11.) She argues that once she started taking the medication that she claims caused her "issues of sitting up and swaying back and forth at night[,]" she immediately took action to change her bunk assignment. (*Id.*) Finally, she contends that the injuries caused by her fall resulted in memory impairment, making her inability to say exactly which Pittsburgh CCC employee she talked to or what she may have told them about her need for a bottom bunk reasonable.[10] (*Id.* at 10-11.)

Even assuming that Graham's memory was impaired by her fall, there still must be some evidence in the record to connect Defendants to the alleged constitutional violation. Yet the

---

[10] "Graham suffered a brain injury and continues to be on antiseizure medication, [sic] she further testified that she has memory issues now [sic] therefore it is reasonable for her to not remember every exact individual that she talked to from [Pittsburgh] CCC regarding her request for bottom bunk status." (ECF No. 53 at 10-11.)

8

evidence of record reflects no alleged misconduct on the part of the named Defendants.[11] Before arriving at Pittsburgh CCC, Graham had spent months sleeping in the top bunk at various DOC-operated facilities without incident. (ECF No. 49 at 8.) The medications disclosed on her Pittsburgh CCC intake form were the same medications that she was taking while housed at Renewal, where she had no documented incidents sleeping in a top bunk. (ECF Nos. 51-1.) She also reported that she was in good health and had experienced no medical concerns within the past 30 days. (ECF No. 51-2.) Thus, at the time of her arrival, there was no reason for Pittsburgh CCC employees to be on notice that assigning Graham to a top bunk would pose an excessive risk to her health or safety. Moreover, there is no evidence in the record that Graham's sleep issues related to Suboxone, either alone or in combination with other medications. The record therefore lacks evidence to support that Graham even had a serious medical need that would have required her to be assigned a bottom bunk in the first place.

As to the individual defendants, Graham testified at her deposition that she does not recall ever interacting with Defendants Dotson, Richardson, Smith, Leap, Dorsey, and Ragland-McClurkin. (ECF No. 51-4 at 47-49.) And beyond Graham's own testimony of her one conversation with Lee about sleeping on the floor (*Id.* at 48), nothing in the record supports an inference that Lee knew of Graham's desire to switch bunks, let alone of any serious medical need.

Graham did discuss moving to a lower bunk with Niles. Graham recalled the conversation at her deposition:

Q. And did you raise the issue of being on Suboxone on the top bunk with [Niles]?

A. Yes.

---

[11] Notably, the Complaint in this action includes no factual allegations about seven of the eight defendants beyond identifying them.

> Q. What do you recall about that conversation?
>
> A. I recall just telling her that I was sitting up in my sleep and I didn't feel safe because I felt like I was just going to, like, tumble over. Don't quote me, I'm almost positive that it was Miss Niles I talked to, but honestly, I really don't remember if I did tell her. I believe I did; I'm not a hundred percent sure, 'cuz she was my counselor.
>
> Q. To the extent you remember that conversation did you reference the Suboxone, or did you just say you'd been sitting up and had concerns?
>
> A. Um, she knew I was on Suboxone but I don't think I made her aware that that was why I was sitting up.
>
> Q. And what did she say in response?
>
> A. Um, oh my God, I feel like it's so long ago. I believe she said that she would look into, she would look into possibly getting me moved to a bottom, I think. I'm trying to remember the conversation. I believe she said that she was going to look into, she'd look into, um, possibly getting me into a bottom bunk, I think, I'm trying to remember, but it seemed like forever, it wasn't, like, moving along so, like, I was asking, started asking more.

(ECF No. 51-4 at 36-37.)

While Niles recalls Graham asking to move bunks, Niles said that she had "no power" over reassigning bunks. (ECF No. 55-2 at 29-30.) Instead, Niles instructed Graham that she would need to obtain a doctor's excuse stating that a lower bunk was medically necessary. (*Id.* at 26-27.) Niles never received a note from Graham's doctor. (*Id.* at 26.)

Graham also could not remember if she ever submitted any type of written request to change bunks but admits that she never discussed the situation with Dr. Payel. (ECF No. 51-4 at 35, 39, 50.) The evidentiary record in this case does not contain a doctor's note, written request, or any evidence of a conversation with any of the Defendants relating to Graham's bunk assignment. Additionally, the prescription medications that Graham blames for her trouble sleeping were prescribed by a non-DOC physician outside the purview and control of Pittsburgh

10

CCC. Thus, Pittsburgh CCC employees would not have had access to the medical records showing that Graham started taking these medications and the only way that Pittsburgh CCC would have known about the addition of any new medications would have been if Graham herself had told them. There is no record evidence demonstrating that this occurred.

While the Court is certainly sympathetic to Graham's injuries, there is simply nothing in the record to support an inference that any of the Defendants had any personal knowledge of Graham's desire to switch bunks or knew that she may be at an increased risk of falling from the top bunk. Thus, when viewing the record in the light most favorable to Graham as the non-moving party, Graham has failed to carry her burden of demonstrating that Defendants were deliberately indifferent to a serious medical need. Defendants are therefore entitled to summary judgment in their favor as to Graham's Eighth Amendment claim.

**B. Negligence claim**

Defendants argue that they are entitled to sovereign immunity as to Graham's general negligence claim because there is no evidence that Defendants acted outside the scope of their employment and none of the enumerated statutory exceptions apply. (ECF No. 49 at 9-10.) Graham does not argue that any of the statutory exceptions apply here.[12]

Under Pennsylvania law, "the Commonwealth, and its officials *and employees acting within the scope of their duties*, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity. 1 Pa. Cons. Stat. § 2310 (emphasis added). There are ten exceptions to sovereign immunity. 42 Pa. Cons. Stat. § 8521(a), § 8522(b). "Exceptions to sovereign immunity are to be

---

[12] Rather than focusing on sovereign immunity, Graham's brief argues that Defendants are not entitled to *qualified* immunity, which is irrelevant here. (*See* ECF No. 53 at 11-12.)

narrowly construed." *Dean v. Commonwealth, Dep't of Transp.*, 751 A.2d 1130, 1134 (Pa. 2000). The facts of this case do not fit within any of the enumerated statutory exceptions. Defendants are therefore entitled to summary judgment in their favor as to Graham's negligence claim.

## V. Conclusion

For these reasons, Defendants' Motion for Summary Judgment (ECF No. 48) will be granted.

An appropriate order will follow.


Dated: December 20, 2024                    /s/ Patricia L. Dodge
                                            PATRICIA L. DODGE
                                            United States Magistrate Judge